UNITED STATES of America, Plaintiff,

v.

ONE PARCEL OF REAL ESTATE consisting of approximately 4,346 acres, located in Glades County, Florida, together with all appurtenances thereto and all improvements thereon, a/k/a the "S.J. & W. Ranch," Defendant.

No. 88–12082–CIV.

United States District Court,
S.D. Florida.

May 5, 1994.

---

Robert A. Rosenberg, Asst. U.S. Atty., Ft. Lauderdale, FL, for plaintiff.

J. David Pobjecky, Winter Haven, FL, Phillip E. Kuhn, Lakeland, FL, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HOEVELER, Senior District Judge.

THIS CAUSE was tried before the undersigned without a jury on October 12, 13, 14, 15, and 29 and November 1, 2, 3, 4, and 8, 1993. Having reviewed the file and the various documents, photographs and other items submitted as evidence, having heard and considered the testimony of the witnesses and the arguments of the parties at trial, and further, having reviewed pertinent parts of the transcript of the hearing held in March 1993, the Court now makes the following findings of fact and conclusions of law pursuant to Rule 52(a), Federal Rules of Civil Procedure.

### BACKGROUND

This is a civil forfeiture action brought pursuant to 21 U.S.C. § 881(a)(7). On September 13, 1988, Plaintiff United States of America filed this *in rem* forfeiture action against the Defendant, 4,346 acres of real property[1] owned by the S.J. & W. Ranches,

---

1. According to the United States, the property is legally described as follows:

The following described property located in Section 14, Township 39 South, Range 33 East, NW ¼ of canal *AND* the N 20 acres of S ¼ W of canal *AND* the NW ¼ of SW ¼ *AND* the NE ¼ of the SW ¼ S of canal, except right-of-way of C–40.

The following described property located in Section 15, Township 39 South, Range 33 East:

E ½ of SW ¼ *AND* E ¾ of the NW ¼ of the SW ¼ *AND* SW ¼ of SW ¼ *AND* SE ¼ *AND* all fractional *AND* Lots A and B in N ½, except C–40 and L–60 right-of-way.

All of Section 33, Township 39 South, Range 33 East.

All of Section 28, Township 39 South, Range 33 East, LESS lands in Northwest Corner lying in Indian Reservation, and LESS lands owned by Central & Southern Florida Flood Control District.

Inc., (S.J. & W.), in Glades County, Florida. An amended complaint for forfeiture was filed on October 4, 1989. The S.J. & W. corporation filed a claim of ownership[2] in response to the forfeiture action, denying that the property was subject to forfeiture. On January 17, 1991, S.J. & W. filed an answer and affirmative defenses to the Amended Complaint for Forfeiture.

The alleged basis for forfeiture is that one section of the Defendant property was "intended to be used as a landing site, offloading point and distribution center" for approximately four hundred (400) kilograms of cocaine. The drugs were imported by an organization controlled by Alan Parrott. The intended delivery, via clandestine air travel, was scheduled for February 7, 1986. Evidence of an unsuccessful attempt to land a plane was discovered on the Brighton Seminole Indian Reservation, approximately ¼ mile from the border of the S.J. & W. property, on February 17, 1986. Following the crash, several individuals not directly involved in this current action were arrested and criminally convicted on drug smuggling and conspiracy charges related to their involvement in the Parrott organization. *See State of Florida v. Roosevelt Bray*, Case No. 86–14795 CF A; *State of Florida v. Nathan Platt, Jr.*, Case No. 86–14795 CF D. The United States filed this forfeiture action 31 months after the incident which is alleged to have rendered the property subject to forfeiture.

In its answer to the forfeiture complaint, S.J. & W. affirmatively denies the existence of an airstrip, claims no "knowledge, consent or participation" in the acts alleged as the basis for forfeiture, and argues that the United States did not have probable cause for

forfeiture. *Answer*, p. 7. The corporation also claims that the Defendant property consists of ten (10) distinct titled parcels or tracts of land, each separately recorded and separately liable for real estate taxes.[3]

As an additional affirmative defense, claimants allege that no notice was given to the Defendant property's owner, S.J. & W., nor to any of the owner's agents, servants or employees, that the defendant real estate was subject to forfeiture before the Complaint was filed. The due process requirements of pre-seizure hearing and notice are applicable to civil in rem forfeiture proceedings against real property, although a violation of these due process rights need not invalidate the forfeiture. *United States v. James Daniel Good Real Property*, —— U.S. ——, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993). As the Court has determined that the property should be returned to the Claimants it is unnecessary to further address the due process concerns presented by the government's failure to provide pre-seizure notice.

## PROCEDURAL HISTORY

S.J. & W. initially moved to dismiss the amended complaint, based on a lack of probable cause. On March 13, 1990, this Court denied S.J. & W.'s motion, but noted that "the factual basis for probable cause only barely passes legal sufficiency." *Order*, March 13, 1990.

On November 23, 1990, this Court granted partial summary judgment in favor of the United States on the issue of probable cause, finding that "the Government had a reasonable basis for believing the property was subject to forfeiture." *Order*, November 23, 1990, p. 6. At the same time, the Court

---

Lots A, B and C, less L–60 right-of-way in Section 21; All of Section 22; All of Section 27, Less right-of-way described in OR Book 2, page 444; NW ¼ and Lots 1, 2, 3 and 4 and the reclaimed lake bottom land lying adjacent to L–49 in Section 35, and a parcel of lake bottom land lying adjacent to L–49 in Section 36. All in Township 39 South, Range 33 East. All of Section 34, Township 39 South, Range 33 East LESS lands owned by Trustees of Internal Improvement Fund of the State of Florida; and LESS rights-of-way of record; and LESS right-of-way as recorded in OR

Book 2, page 444, public records of Glades County, Florida.

2. For clarity's sake, this order shall refer to the Claimant (the owners of the defendant property) as S.J. & W. The Defendant property itself shall be noted as the S.J. & W. Ranch.

3. On August 14, 1992, S.J. & W. moved to amend its answer, adding a claim for attorneys fees and costs pursuant to the Equal Access to Justice Statute. The Court hereby GRANTS that motion to amend, *nunc pro tunc*.

denied S.J. & W.'s cross-motion for summary judgment on the probable cause issue and ruled that the cross-motion for summary judgment on the innocent owner defense was premature, since discovery was incomplete at that time.

S.J. & W. then filed a Motion asking the Court to reverse the entry of summary judgment on the probable cause issue and seeking an evidentiary hearing on its claims that the law enforcement affidavits, on which the Court had relied in assessing probable cause for the forfeiture, had contained deliberate falsehoods or were made with reckless disregard for the truth. The Supreme Court, in *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), established the right of a criminal defendant to challenge the veracity of an affidavit used by police to secure a search warrant. Although the Eleventh Circuit had not yet ruled on the appropriateness of a *Franks* proceeding to challenge affidavits submitted on the probable cause issue in a civil forfeiture action, this Court found support in the First and Second Circuits and ruled that "*Franks* is available to challenge the veracity of affidavits submitted by the Government in a civil forfeiture case." *Order*, July 22, 1993, p. 3, n. 2. The Court conducted a hearing in response to S.J. & W.'s allegations.

■ To successfully present a *Franks* violation and demonstrate that a warrant was based on a false affidavit, the "defendant must show that (1) the affidavit contained false statements; (2) the statements were material to the issue of probable cause; and (3) the false statements were made knowingly and intentionally, or with reckless disregard for the truth." *Franks v. Delaware*, 438 U.S. at 155–56, 98 S.Ct. at 2676. The claimants' allegations related primarily to the law enforcement officers' limited disclosure of the questionable credibility of confidential informant Larry Fernandez, the alleged recantation of Nathan Platt's corroborating statement, and the disputed timing of the officers' aerial inspection of the S.J. & W.

property. This Court's Order of July 22, 1993, found that S.J. & W. did not carry its burden, under *Franks*, of showing that the affidavits contained deliberate falsehoods or were prepared with reckless disregard for the truth.

■ However, as a result of the evidence presented at the *Franks* hearing, the Court reversed its prior ruling on probable cause. *Order*, July 22, 1993. The Court found that there were specific questions involving disputed facts raised by the evidence submitted at the hearing.

1. The Court finds that there is a disputed question as to whether a landing strip existed, or could have existed, on the S.J. & W. property in February, 1986, either in the Lake Pasture or in any other area of the Ranch in proximity to the Brighton Seminole Reservation. Similarly, it is unresolved whether the Government's witnesses and/or the police investigators have confused S.J. & W. with another ranch that shares a western or northwestern boundary with the Brighton Seminole Reservation.

2. There also is a disputed issue of fact whether the Piper Navajo which crashed on February 7, 1986, in the Brighton Reservation was attempting to land on or near S.J. & W. property, or was in full flight en route to Tampa or another destination north of the Okeechobee area.

3. Even if the Government ultimately prevails at trial on the issue of probable cause, with respect to the "innocent owner" defense, there remains pursuant to 21 U.S.C. § 881(a)(7) a disputed fact as to whether the owners of S.J. & W. were aware, or should have been aware[4], that any drug smuggling activity had taken place on their property.

*Order*, July 22, 1993, p. 11 (*footnote added*).

The Court then set the case for trial. Subsequent to the *Franks* inquiry, but prior to commencement of trial, the Supreme Court

---

4. The standard for proving innocent ownership has been clarified since the date of the Court's earlier Order. Pursuant to *United States v. 6960 Miraflores Avenue*, 995 F.2d 1558 (11th Cir. 1993), an innocent owner must only establish a lack of actual knowledge of the criminal activity. The government's proof of constructive knowledge, i.e., that an owner "should have known", is not sufficient to overcome the claim of innocent ownership.

announced its decision in *Austin v. United States,* —— U.S. ——, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993). S.J. & W. filed a Motion to Dismiss the forfeiture complaint based on the application of eighth amendment concerns as noted in *Austin.* S.J. & W. also filed a Motion to exclude any testimony from the DEA concerning the amount of drugs alleged to have been on the plane, arguing that *Austin* required a balancing of the value of the property sought to be forfeited with the value of the drugs involved in the crime, and that such determination required proof by the strictest standard, not through hearsay testimony. At trial, on October 12, 1993, the Court conditionally admitted the testimony of Agent Fleckenstein of the DEA, for the limited purpose of later eighth amendment arguments under *Austin.*

The testimony in this case included significant amounts of admissible hearsay, photographs, and agricultural exhibits. This Memorandum and the Court's findings will address the record evidence in some detail, first concerning the government's attempted proof of probable cause for forfeiture, followed by a discussion of claimant's efforts to establish innocent ownership.

## I. FINDINGS OF FACT

### A. Probable cause that the property was used to import drugs

1. A Piper Navajo 310, registration number N7EA, crashed in early February 1986, on the Brighton Seminole Indian Reservation.

2. Sergeant Tommy Herne (hereinafter Sergeant Herne), of the Glades County Sheriff's Department, first investigated the crash on February 17, 1986, then again with Agent John King (hereinafter Agent King), of the Florida Department of Law Enforcement, on February 27, 1986. *Trial testimony of Sergeant Herne,* November 8, 1993, *Deposition of Agent King,* page 35. Sergeant Herne left such physical evidence as he collected with the Glades County Sheriff's Department upon the later termination of his employment. No physical evidence was produced at trial. This evidence was described as "missing".

3. Through statements of individuals involved in the drug smuggling conspiracy, law enforcement officials have determined that the plane was scheduled to land on the Defendant property with a load of cocaine and that the crash took place on February 7, 1986. The United States, through Agent King, offered the statement of Henry Arroyave, a convicted drug smuggler who was known as a supplier of Colombian cocaine. According to his trial testimony on October 12, 1993, Agent King interviewed Mr. Arroyave while he was incarcerated at the Hernando County Jail. Mr. Arroyave told Agent King that Carlos Mejia, a former associate of Mr. Arroyave's and a member of the "offload crew" waiting for the delivery of cocaine, had been an eyewitness to the crash. Mr. Arroyave told Agent King that Carlos Mejia had telephoned Colombia to tell Mr. Arroyave that the plane had crashed. *Trial testimony of Agent King,* October 12, 1993. This testimony, which is based on double hearsay, is a primary source of the United States' information concerning the exact date of the crash, the intended landing area and the nature of the cargo aboard the Piper Navajo. The eyewitness has never testified. During his deposition in January 1992, Agent King also stated that he never spoke to Carlos Mejia and that "Carlos Mejia is allegedly dead." *Deposition of Agent King,* January 8–9, 1992, p. 194. Agent King stated at his deposition that Henry Arroyave was "simply the provider and overseer of the operation in Colombia", and that Arroyave did not provide information about the landing strip or its identification. *Id.* at 174.

■ At trial, the United States refused to provide Claimants' counsel with any documentation of Agent King's interview with Mr. Arroyave, claiming that Agent King's report of the interview was "privileged". The United States seeks to have this Court credit Agent King's testimony about what Mr. Arroyave—a convicted drug smuggler and co-conspirator—heard from Mr. Mejia—an allegedly dead eyewitness to the crash. While hearsay testimony is admissible to establish probable cause in civil forfeiture trials, it is clear that the Court must evaluate such testimony with considerable care. As I am un-

able to assess the credibility of Mr. Arroyave his reported account will be given minimal value. However, based on other evidence submitted in this case, including a crash report prepared by the National Transportation Safety Board, Ex. 30[5], the Court accepts as fact that the crash occurred prior to February 17, 1986, and, for purposes of this opinion, will assume that the crash occurred on February 7, 1986.

4. Some witnesses testified that there was no evidence of lights in the sky or on the ground in the vicinity of the alleged strip on the evening of February 7, 1986. *Trial testimony of Harvey Thomas,* October 29, 1993; *Trial testimony of Bill Wiersma,* November 3, 1993. No live witnesses were able to testify at trial as to any activity, illegal or otherwise, on the Defendant property on the night of the crash. There was evidence of heavy fog in the area. *Trial testimony of Richard Coxey,* October 14, November 2, 1993.

5. No drugs were recovered from the wreckage of the Piper Navajo 310. No physical evidence from the crash (other than photographs of debris) was submitted at trial. Sergeant Herne testified at trial that he found seven grommets (apparently from duffel bags) at the scene of the crash. The United States argues that the grommets, as well as evidence that the plane had been modified for long distance cargo transport (e.g., enhanced fuel storage capacity and removal of additional seats in the plane), prove that the plane was intended to be used to transport drugs.

6. According to the FAA, no flight plans had been filed for aircraft N7EA surrounding the time of the crash. The same aircraft had previously been associated with D.M. Woods, Control Data of Canada and Beha, Inc. (Egypt), and was "involved in the shipment of Artillery Fire Control Computer systems technology with military use from the U.S. to Canada and then to Egypt." *Report of Agent King,* Florida Department of Law Enforcement, January 7, 1987, Ex. # 97. It is, of course, entirely possible that such earlier long distance cargo transportation might have resulted in the modifications which were discovered in the investigation of the crash. The Court does not accept such evidence of modifications to the plane, standing alone, as conclusive proof of the plane's use to transport drugs on February 7, 1986.

7. The United States has relied on statements of Lazaro Fernandez (hereinafter Mr. Fernandez), who was repeating information he obtained from Carlos Mejia, to determine that the flight was intended to import 400 kilograms of cocaine, but that only 180 kilos were present on that fateful night flight. In his "Affidavit in Aid of Extradition" of Roosevelt Bray, Agent King testified that the aircraft's cargo on February 7, 1986, was approximately 800 pounds of cocaine. *Affidavit of Agent King,* sworn before Judge Mel Grossman, Circuit Court Judge, Seventeenth Judicial Circuit, Broward County, Florida, dated November 4, 1986. The Court is unable to conclusively determine the quantity of drugs, if any, that may have been on board that ill-fated flight.

8. Determining the location of the alleged landing strip, if any, in that area intended to be used on February 7, 1986, provided a challenge to law enforcement officers. Initially, the primary source of identification of the Defendant property was Mr. Fernandez, who was apprehended on June 27, 1986, in connection with a smuggling incident that formed the basis for the Tucker ranch forfeiture case. *United States v. 4,657 Acres,* 730 F.Supp. 423 (S.D.Fla.1989) (owners of ranch successfully established innocent owner defense). Mr. Fernandez was released during his period of cooperation with law enforcement authorities, and gave his first of many statements to law enforcement officers investigating narcotics trafficking in the region. Some of these statements provided information concerning the February 7, 1986, crash of the Piper Navajo.

Agent King first interviewed Mr. Fernandez on June 28, 1986, the day after Agent King visited the crash site, then again with Sergeant Herne on July 11, 1986. *Deposition of Agent King,* January 8–9, 1992, page 132. At the first interview, Mr. Fernandez never identified a specific landing site, *id.* at

---

5. All references are to exhibits offered by Claim-

ants, unless otherwise indicated.

pages 137–38; said he wasn't present at the crash, *id.* at page 145, pages 162, 281; and stated that he had never been to the site, *id.* at pages 146, 164. Mr. Fernandez's story went through various transformations, such that at his most recent interview, in August 1993, Mr. Fernandez not only identifies the property, but also states that he was on the property for another clandestine delivery of controlled substances in August 1985. *Trial testimony of Agent King,* October 12, 1993.

Mr. Fernandez never identified the strip with any particularity except by pointing to a place on a map during his early interviews with Agent King and Sergeant Herne, and this map—which is apparently lost (*Affidavit of Agent King,* October 8, 1992, p. 6, paragraph 15; *Deposition of Agent King,* January 8–9, 1992, page 371)—was never presented to the Court. Mr. Fernandez also initially identified the strip on "Beck's" land, or on a large farm. Mr. Fernandez has also sworn that he was never on the alleged landing strip on the Defendant property. *Grand Jury testimony of Mr. Fernandez,* Ex. 39, pp. 15, 39.

The United States acknowledges that Mr. Fernandez committed perjury on June 10, 1987, during a deposition relating to a Martin County investigation, *Letter from F.D.L.E. to Judge Trowbridge concerning Mr. Fernandez,* June 10, 1987, Ex. 8 (formerly Ex. 11 at March hearing). On July 14, 1987, Mr. Fernandez was arrested in Monroe County and charged with possession of cocaine. *Letter from F.D.L.E. South Region Operations Bureau Chief Rolando D. Bolanos to Judge Trowbridge in Stuart, Florida,* August 13, 1987, Ex. 13 to January 9, 1992 *Deposition of Agent King.* On July 30, 1987, Mr. Fernandez was further charged with conspiracy with intent to defraud the United States by uttering, selling or buying counterfeit federal reserve notes. *Id.; see also, F.D.L.E. Report* concerning Mr. Fernandez's participation in these crimes, dated August 1, 1987, Ex. 9 (formerly Ex. 12 at March hearing).

9. Initially, the clandestine landing strip was alleged to be on lots A, B, and C, "part of Scarborough"[6]. *Affidavit of Sergeant Herne,* April 30, 1990, submitted with U.S.

Motion for Summary Judgment on Probable Cause, Claimant's Ex. 2 at trial, p. 2. Later, this location was discarded in favor of a location further south, more in accord with the debris of the plane crash. The United States asserts that the strip lies in an east to west direction. Expert witnesses for S.J. & W. assert that the wreckage indicates that a landing strip would have been in a north to south direction.

10. As stated above, Mr. Fernandez initially referred to the airstrip on a map which was not produced at trial—and was apparently "lost", according to testimony of Agent King and Sergeant Herne at trial—and noted that the strip was on Beck's property. In addition, Mr. Fernandez described the property as a "big farm ... about 5,000 acres". *Transcript of Interview of Mr. Fernandez,* July 11, 1986, Ex. 6 (formerly Ex. 9 at March hearing), p. 13. Mr. Fernandez also stated that "immigrants work in there. Mexicans." *Id.* He noted that the landing strip runs from south to west. *Id.,* p. 14. He later stated that the strip runs from south to north. *Id.,* p. 45. During this interview Mr. Fernandez used the missing map to describe the location of an airstrip apparently used in November 1985, based on directions he had received from members of the smuggling operation, although Mr. Fernandez claims to have not been on the strip. According to Mr. Fernandez, when approaching the area in question from Miami on Highway 78, one must turn left at the Circle K store. His directions from that point appear inconsistent, and the transcription of the interview is interrupted by an "off-record discussion" that was not transcribed. *Id.,* p. 16. At one point Mr. Fernandez indicates a location on the map that is inside the reservation, according to Sergeant Herne. *Id.,* p. 46.

The government's case both as to probable cause and in response to Claimants' innocent owner defense at trial rested somewhat precariously on the credibility of Mr. Fernandez as well as some other alleged participants in the plane venture whose reliability was equally questionable. As noted above, Mr. Fernandez committed perjury in a Martin

---

6. Scarborough was the former commonly used name of the Defendant property.

County case, but explained that he had done so out of fear for the safety of his family. Mr. Fernandez was also reported to be involved in counterfeiting U.S. currency, and possession of illegal substances.

11. In connection with his investigation of the smuggling operation on the Tucker Ranch, Agent King reports that Mr. Fernandez stated that Edward (Beebo) Womble was the middle man for the owner of the [Tucker] property intended to be used as an airstrip in June 1986. *F.D.L.E. Report*, dictated by Agent King, July 29, 1988, Ex. 84. Upon arriving at the airstrip on the Tucker property one week prior to the smuggling incident, Mr. Fernandez was met by Womble, Alan Parrott, and an unknown person in a blue pickup truck. Mr. Fernandez "could not seen [sic] the occupant of the truck but was told by Womble that he would have to leave as the owner in the truck did not want to be on the property at the same time as he (Mr. Fernandez) and the cocaine." *Id.* Mr. Fernandez also stated that, on the night of the Tucker venture, he noticed that there was another person on the offload site with Womble, but he was "unable to see his face as it was dark and the person stayed at a distance." *Id.*

12. This inability to recognize a person in a blue truck was allegedly duplicated on the S.J. & W. property when, in an early questioning by Agent King, Mr. Fernandez also stated that he saw someone in a truck on the S.J. & W. property whom he couldn't identify. According to an earlier report by F.D.L.E., Mr. Fernandez was met by a white male driving a truck on February 8, 1986, as Mr. Fernandez and Nathan "Buddy" Platt were en route to the crash sight of the Piper Navajo 310. This individual was identified as "possibly being" Richard Platt. *F.D.L.E. Report of Agent King*, typed November 10, 1986, Ex. 83. The most recent recollection of Mr. Fernandez has identified Bill Wiersma (husband of Toni Jones Wiersma [7]) as having been seated in a blue pickup truck, somewhere near the Defendant property. *Trial testimony of Agent King*, October 13, 1993.

In response to a question from the Court, Agent King stated that he first learned of Bill Wiersma's possible connection to the case on September 30, 1988, when Mr. Fernandez tentatively identified Bill Wiersma as the white male in the truck. *Id.* By the osmosis provided by the passage of time, Mr. Fernandez grew more and more certain of the identity of the man in the truck and then later, with alleged 100% accuracy, identified Bill Wiersma as the mystery man.

The reference to the Tucker property, which is not at issue, is only to show the difficulty that Mr. Fernandez experienced in recollecting the identity of individuals present on the Defendant property, if indeed Mr. Fernandez was there. It is of interest to note that, unlike the majority of the populace, Mr. Fernandez's memory seemed to improve rather than fade away with the passage of time, so that, remarkably, in 1993 he did what he couldn't do in 1988 or earlier: he identified Bill Wiersma as having been the white male wearing a large hat, sitting in a blue pickup truck on the Defendant property at or near the time of the Piper Navajo 310 crash; this statement following the earlier one that he had never been on the site.

13. Another witness upon whom the Government relies is Nathan "Buddy" Platt. Platt did not appear at trial. His various statements were offered through Agent King. Law enforcement officers, particularly Sergeant Herne, isolated Nathan Platt and persuaded him to talk to them. In that statement, Nathan Platt initially denied any illegal association with Alan Parrott, *Statement of Nathan Platt*, August 25, 1986, p. 4–5, Ex. 10. Reluctantly, and after vigorous questioning by the officers, Platt admitted that, on three or four occasions, he "[rode] the highway between the Harney Pond Canal and Indian Prairie [Canal] . . . with a portable radio." *Id.*, p. 8. He implicates his two brothers, Dale, and Richard (Dickie). Dale rode with Nathan on lookout, and Dickie, who had keys to the gate, unlocked the gate to Claimants' property. *Id.*, pp. 12, 17. Platt admits, *id.* at p. 9, that he will lie to the

---

7. Mrs. Wiersma is one of the shareholders of S.J. & W. Mr. Wiersma does not own any shares in the corporation.

officers unless he has some assurance that he will not be going to jail. This admission, it would seem, places the veracity of the entire statement in question.

14. Platt's identification of the Defendant property during that interview is problematic. The following is the exact exchange during his interview:

Sergeant Herne: ... where did the plane land?

Platt: Next to the Indian Reservation.

Sergeant Herne: But, not on Indian Reservation land, right?

Platt: Um, hmm.

Agent King: Whose land was it on?

Sergeant Herne: East of 721, State ... County Road 721?

Platt: Yeah.

Sergeant Herne: East of ... between 721 and Indian Prairie Canal.

Agent King: You know where it's at?

Sergeant Herne: Exactly, I already found it. I told you I did.

Agent King: Running North and South?

Sergeant Herne: Yeah. I told you I'd found it. Who owns that property?

Platt: Scarbrough [sic].

Sergeant Herne: You sure it's Scarbrough [sic]?

Platt: Yep.

Sergeant Herne: You sure it's not Roger Jones?

Platt: Um, hmm. It's Scarbrough.

Sergeant Herne: How did Alan Baker Parrot [sic] and his off load crew get into that property?

Platt: Um, Tommy, man, you're gonna make me incriminate somebody else....

Sergeant Herne: You want me to tell you how?

Platt: Yeah.

Sergeant Herne: How about the gate right there, by Ada Beck's barn? On the dike?

Platt: You're wrong there.

Sergeant Herne: Okay. So, correct me.

Platt: God damn it, you're gonna make me incriminate somebody.

Sergeant Herne: I know. I can't help that. I don't have any control of that.

Agent King: Dale [Platt], Dale works out there ...

Platt: No, no hell he don't neither, you're wrong there. It's another brother and I don't want to call no names.

Agent King: Wes?

Sergeant Herne: I know who it is.

Platt: Okay, then.

Sergeant Herne: I told him this morning.

Platt: If you know then, I ain't got to say. It's not Dale. See, I don't want ya'll throwing everything on me and Dale.

Sergeant Herne: Dickey [sic]. It's Richard Ivan Platt.

Platt: Dickey [sic] was in it just as ... deep as we were, Tommy.

Sergeant Herne: Buddy, who had the key to the gate that had to be opened each time? Is it Dale or Dickey?

Platt: Dickey.

Sergeant Herne: They going in that Roger Jones's place?

Platt: I don't even know ... who in the hell is Roger Jones?

Sergeant Herne: That's Scarbrough [sic], where the tin barn is.

Platt: No, they ain't going there. They went in at the wooden gate at the bridge.

. . . . .

Sergeant Herne: How did Dickey end up with a key to that gate?

Platt: He's the foreman.

Sergeant Herne: Okay.

. . . . .

Sergeant Herne: How much were you paid to do whatever is [sic] you done?

Platt: Somewhere from five hundred ($500.00) to a thousand dollars ($1,000.00).

Sergeant Herne: Each time?

Platt: Yeah.

Sergeant Herne: Who paid you?

Platt: Alan.

. . . . .

Platt: Dickey unlocked the gates and then he stayed by the gate and me and Dale

road the highway. And, that's all we did, Tommy.

*Id.,* pp. 10–12, 17.

There was no mention whatsoever of Bill Wiersma in this statement. The statement about the amount of payment and its source is somewhat contradicted by an earlier report of Agent King. In that report, Agent King refers to a second statement obtained from "the confidential source, previously interviewed by Special Agent King on the 27th of June, 1986." *Report of Agent King,* date dictated July 24, 1986, Ex. 80, p. 1. "The source related that he also recalled that Alan Parrott had said that he had paid Dale $100,000 to $150,000 for the use of the airstrip and that amount was to be split between Dale [Platt], Buddy [Platt], and Wes." *Id.*

15. Nathan "Buddy" Platt has equivocated about his initial statement on three occasions—most recently in the September 1993 deposition taken by the United States (not offered). In a proceeding in Georgia state court, Nathan Platt admitted that not everything that he told the Florida police on August 25, 1986, was true. *Transcript of the Testimony of Nathan Buddy Platt, Jr. at Trial, State of Georgia v. Alan Baker Parrott,* Case No. 89R–1393, Ex. 12. On appeal, Platt's Florida state criminal sentence was overturned and his August 25, 1986, statement was ruled inadmissible by the Fourth District Court of Appeals. *Nathan Platt v. State of Florida,* 515 So.2d 1068 (4DCA 1987).

16. Platt arguably recanted his statement at a state court sentencing hearing when he stated that, "No, that night I wasn't there. I said stuff in that—I was scared half to death, and I didn't remember saying half of it when I read it. I couldn't believe I said it." *Transcript of Sentencing before Judge Mel Grossman,* February 13, 1987, page 18, Ex. 11.

Even if the Court gives some credence to Mr. Platt's contradictory statements, all that is established is that he was hired as a lookout on a state highway running in front of several large pieces of property. Platt's identification of the property is not conclusive. According to the statement of August 25, 1986, pages 10 and 11: "[Q: Where did airplane land?] Next to the Indian Reservation.... [Sergeant Herne states: "I already found it.... Who owns that property?"] Scarbrough." Platt may have simply been identifying the owner of an indicated plot of land, rather than independently alleging that the Scarborough land was intended for use as a landing site. Even after Platt's statement, Sergeant Herne did not physically inspect the property because, according to his testimony, he "wasn't sure [he] would have enough probable cause" to do so. *Deposition of Sergeant Herne,* page 154, *Trial testimony of Sergeant Herne,* November 8, 1993.

17. This Court's Order of July 22, 1993, stated that:

the Court has reviewed the transcript of [the sentencing] hearing and finds no indication that [Platt] specifically recanted his description of the alleged airstrip and the drug ring's alleged use of the S.J. & W. property.

The present determination by the Court that Platt's identification of the property is inconclusive does not alter that earlier finding that Platt had not specifically recanted his description.

18. Both Sergeant Herne and Agent King have repeatedly said that Nathan Platt and Mr. Fernandez were the only sources of pertinent information. *Deposition of Agent King,* January 8–9, 1992, pages 44, 50, 51, 80–83, 87, 144, 192, 221, 255, 257, 259. *Deposition of Agent King,* April 30, 1992, pages 8, 10, 23–24. *Deposition of Sergeant Herne,* pages 41, 42, 48, 49. At no point does Nathan Platt implicate Bill Wiersma or any owner of the property in the drug importation alleged to be destined for the Defendant property.

In summary, the evidentiary value of the statements attributed to Mr. Fernandez and Nathan Platt is very questionable. These witnesses were not produced to testify at trial. Implicit in the government's presentation through the testimony of one or more of the law enforcement officers involved was their own concern, at one time or the other, about the value of the testimony of Nathan Platt and Lazaro Fernandez.

19. As the case developed, the United States began to distance its proof from its

earlier reliance on Mr. Fernandez and Mr. Nathan "Buddy" Platt as the sources of information concerning the location of the property. At trial, the United States announced that James Russell (J.R.) Smith had identified the Defendant property as the site of a clandestine airstrip. J.R. Smith had been interviewed as a confidential informant by Officer Charles (Tom) Kent, of the Broward Sheriff's Office, in connection with other investigations in Broward County. *Trial testimony of Officer Kent,* October 12, 1993. During Officer Kent's testimony at trial, he did not state that J.R. Smith was his confidential informant nor that J.R. Smith had identified the Defendant property. Agent King testified at trial that he did not learn about the identification of the S.J. & W. Ranch from Officer Kent. *Trial testimony of Agent King,* October 14, 1993. According to the trial testimony of Agent King, Officer Kent never disclosed the identity of Kent's confidential informant to Agent King. However, Assistant United States Attorney Robert Rosenberg announced at trial that J.R. Smith was Kent's confidential informant. *Trial testimony of Agent King,* October 12, 1993. On October 7, 1993, Agent King interviewed J.R. Smith, allegedly on a "blind lead", at which time J.R. Smith spoke of the Scarborough property. Agent King then spoke with Officer Kent, who informed him that J.R. Smith had never before spoken about Scarborough. *Trial testimony of Agent King,* October 14, 1993. It is of interest to note that Officer Kent testified on October 12, 1993, that he had heard that on occasion Alan Parrott used the Indian Reservation. *See, also, F.D.L.E. Report,* dated March 4, 1986, Ex. 2A to Deposition of Agent King, January 8, 1992.

Agent King testified at trial that he did not write out his report of the J.R. Smith interview until October 12, 1993. Once again, it is difficult for the Court to assess the credibility of this late-found witness. In the United States' Proposed Findings of Fact and Conclusions of Law, the government identifies "Buddy Platt, J.R. Smith, Deputy Sheriff Tommy Herne and Lazaro Fernandez" as the witnesses who identify the Defendant property, *id.,* p. 23. The Court has already addressed the credibility of Mr. Nathan

"Buddy" Platt, Mr. Smith, and Mr. Fernandez. Sergeant Herne's alleged identification of the property is problematic, as will be developed in the following paragraphs.

21. Perhaps the most significant admission by the United States is that Sergeant Herne, a local law enforcement officer, initially noted that there were two other properties which might have been the intended landing site: the Brighton Seminole Indian Reservation and Beck's Ranch. In fact, during the July 11, 1986, interview of Mr. Fernandez, Sergeant Herne appears to believe that the strip, as located by Mr. Fernandez on the missing map, is on Paul Beck's property. Sergeant Herne also states that there is open pasture on the Beck property. *Transcript of Interview of Mr. Fernandez,* July 11, 1986, Ex. 6, pp. 47–48. Yet, in a deposition taken on January 9, 1992, Sergeant Herne states that Mr. Fernandez did not describe an area that Sergeant Herne thought was on the Beck property. *Deposition of Sergeant Herne,* January 9, 1992, p. 100. In that same January deposition, Sergeant Herne notes that there was a grass area on the Beck property that had been used to land agricultural spray planes, *id.* at pp. 75–76, and that there were areas on the Pearce property (adjoining S.J. & W. to the northeast) that could have been used as landing areas, *id.* at pp. 74–75. At trial, Sergeant Herne also testified as to a prepared grass "strip" of mowed land next to the Interceptor Canal, on Beck's property, and that there were reports of suspicious lights over that property. *See also, March hearing testimony of Bjorn Lusth,* transcript of hearing, pp. 24–25, 272–74. At trial, both Sergeant Herne and Officer Thomas (of the Seminole Reservation police) testified as to reports of drug activity on the Indian Reservation.

22. No law enforcement officer ever physically inspected the Defendant property until August 1993, despite having discovered the alleged landing site as early as February 1986. *Trial testimony of Agent King,* October 13, 1993. Agent King stated in his deposition of January 8–9, 1992, that he went to the scene of the crash with Sergeant Herne on February 27, 1986. *Deposition of Agent*

*King,* January 8–9, 1992, page 35. Agent King later learned from Special Agent H. Lanier that the crash was connected to the Parrott smuggling operation. *Id.,* page 43. Agent Lanier learned this information from James Watts, *id.,* who knew nothing of any landing strip on the S.J. & W. property. *Id.,* pages 44, 50–51. Watts received his information from Gus Ross—a member of the Alan Parrott smuggling organization who never spoke with law enforcement officers. *Id.,* pages 49, 51. Agent King stated that the Defendant property had already become suspect after Sergeant Herne "pointed out the location of this strip initially to me on my first trip to the crash site on the 27th." *Id.,* page 52.

23. According to Agent King's deposition of January 8–9, 1992, he and Sergeant Herne took aerial photographs of the site and noted tire tracks on the land within a month of February 27, 1986. *Deposition of Agent King,* January 8–9, 1992, page 59. The relevant photographs, none of which show tire tracks, are the subject of much dispute. Sergeant Herne's affidavit of April 30, 1990, at paragraph 3, states that he was "familiar with a clandestine airstrip located on the [S.J. & W.] property, having made a personal observation." [8]

During the *Franks* hearing in March 1993, Sergeant Herne and Agent King testified that they flew over the alleged airstrip on or about February 27, 1986, and that Agent King took more than 30 photographs of its alleged location on the parcel of S.J. & W. property that is adjacent to the Interceptor Canal (which separates the Defendant property from the Brighton Seminole Reservation). *Order,* July 22, 1993, p. 6. Sergeant Herne conceded at the hearing that none of the photographs show any tire tracks at all, much less the distinctive pattern made by an aircraft using tricycle landing gear. *Id.* Sergeant Herne says that he saw tracks, but cannot say when. He also stated that he didn't think he had probable cause to enter the land. *Deposition of Sergeant Herne,* January 9, 1992, p. 154.

24. Another perplexing aspect of this evidence is that an enlargement of one of Agent King's photographs clearly shows an excavation that was allegedly not begun on the property until at least June 1, 1986, according to the affidavit of the person who performed the excavation, Earl Beck; (*Affidavit of Earl Beck,* August 4, 1992, Ex. 5 (formerly Ex. 8 at March hearing)). Claimants argue that these photographs must have been taken several months later, and note that Agent King's reports prior to October 4, 1988, do not record this photographic journey and evidentiary discovery. The photographs clearly depict green fields, which Claimants allege to be impossible during the months of February and March. The dominant color of winter pastures in the region is brown, according to S.J. & W. witnesses.

25. As the Court noted in its Order of July 22, 1993, the photographs and other investigatory work done by Sergeant Herne and Agent King, while perhaps rendered difficult by the nature of the event and the geography involved, nonetheless left questions unresolved and spawned conclusions which were questionable. Although there may be plausible explanations for the discrepancy in the alleged dates of aerial observation, it is not necessary, in view of the other evidentiary conclusions of the Court, to further discuss the sufficiency of the photographs as evidence supporting probable cause.

The Court is unable to conclusively determine that the airstrip has been correctly identified as being located on the Defendant property. The failure to originally isolate the Defendant property as the location of the airstrip at the very least raises a serious question as to whether the airstrip could have been located on the Defendant property.

26. In February 1986, the alleged airstrip was covered with aeschynomene, pangola and smut grass. *Trial testimony of Donald Jones,* November 2, 1993; *March hearing testimony of Toni Wiersma,* transcript pp. 37–39, 87; *March hearing testimony of Mar-*

---

8. Also, Officer King noted that Sergeant Herne "is in fact familiar with an airstrip located on the property, having made such observation a week or so prior." *Report of Officer King,* date dictated September 8, 1986, Ex. 82, referring to information received from Sergeant Herne.

*shall Coker* (fertilizer salesman), transcript p. 200; and *March hearing testimony of T.J. Woodward* (fertilizer salesman), transcript p. 191; Live Plants/Photograph, Ex. 104 (A, B, C) and Photograph, Ex. 98 (D, E, F, H, I, J). In addition, the property contained bull holes, cabbage palm trees, hog rootings and cow trails. *March hearing testimony of Toni Wiersma,* transcript pp. 33, 87, 90; *March hearing testimony of Bjorn Lusth,* transcript p. 244; *March hearing testimony of T.J. Woodward,* transcript pp. 190–91; and *March hearing testimony of Marshall Coker,* transcript p. 202; Photograph, Ex. 98 (B, C, G, H, K) and Photograph, Ex. 99A.

27. The Court was fortunate to have the assistance of several aeronautical experts. For the Claimants, Douglas Stimpson (a Piper aviation expert), William P. Kelly (a former test pilot for Piper), and Russell McKnight (a crash investigator, who testified at the March hearing only). For the United States, Sean Knickerbocker (a pilot with U.S. Customs), Paul Kersten (a convicted drug pilot), and Richard Coxey (a pilot and crash investigator). Of these, Stimpson was the most impressive for his considerable knowledge of the technical specifications and capabilities of the specific model of plane involved in this incident. The Court found Mr. Stimpson's testimony to be highly credible. Expert witness Mr. Kelly actually drove a truck over the field. He testified that the truck was "coming apart" at relatively low speeds (approximately 35 m.p.h.). *Trial testimony of Kelley,* October 29, 1993.

The conclusion that I will draw from the several experts is that the Piper Navajo could not have landed on this field and then been capable of taking off again. The nose gear, which is critical to a successful landing and take off, would have broken at one time or the other. *Trial testimony of Douglas Stimpson,* October 14, 1993; *March hearing testimony of Russell McKnight,* transcript p. 343. A serious question as to the use of the land as a clandestine airstrip was presented by the expert testimony. This would be particularly true of a Navajo carrying several hundred pounds of cocaine.

28. Even if the land was entirely suitable for landing and take off of a Piper Navajo airplane, there still remains the question of access to the property for the off-load crew of a smuggling organization. The Defendant property, particularly the alleged landing strip, is separated from public access by several gates. There are two main access gates which allow entrance to the property. The flood control gate is the gate at the intersection of the Interceptor Canal and Road 721. The Corps of Engineers gate is at the intersection of State Road 78 and Indian Prairie Canal. In 1986, this gate was apparently constructed of wood.

Sergeant Herne speaks of a gate off of State Road 78, while other witnesses, through Agent King, refer primarily to the gate off Road 721.

29. Mr. Fernandez mentions that there were "at least three gates, including the one right at the entrance" which were separating the road from the airstrip. *Transcript of Interview of Mr. Fernandez,* July 11, 1986, Ex. 6, p. 18. Again, this information came to Mr. Fernandez through someone in the smuggling operation. He also stated that, upon arriving at the Circle K store, the procedure was that he call one of three men, whose names he recalled as Dale, Buddy, or Wes. *Id.,* p. 17. Mr. Fernandez believed that Dale was the foreman of the farm. *Id.,* p. 52. Despite his apparent knowledge of the gates providing access to the Defendant property, in his testimony to a statewide grand jury on September 30, 1986, Mr. Fernandez denied ever being on the strip itself. "The closest I got was two gates inside the farm." *Grand Jury testimony of Mr. Fernandez,* September 30, 1986, Ex. 39, p. 39.

30. Agent King testified at trial that Mr. Fernandez told him that on February 8, 1986, when Mr. Fernandez, Carlos Mejia and Herman Bray were on their way to look for the plane, they were advised by radio not to go to the crash site. *Trial testimony of Agent King,* October 12, 1993. Mr. Fernandez and Mr. Bray went to the Circle K while Mejia went on to the crash site. Upon Mejia's return, they all proceeded along Road 721, and entered a dike, through a "flood control" gate. According to Agent King, these were Mr. Fernandez' words in August of 1993, although Mr. Fernandez had never

before used the phrase "flood control" gate. Agent King testified that Mr. Fernandez also told Agent King that entry to the field was gained by an unsecured, barbed wire gap gate located at the northwest corner of the property. Videotape, Ex. 110. There has never been a wire gap gate leading to S.J. & W. property. *Trial testimony of Donald Jones,* November 2, 1993. On the first day of trial, October 12, 1993, Agent King testified that Mr. Fernandez told him that he never made it to the actual strip but was stopped prior to the entrance to the third gate—perhaps coming from Road 78. *See, also, Deposition of Mr. Fernandez,* May 5, 1987, Ex. 42, pp. 128–29. However, access to the alleged airstrip can be gained by going through only one locked gate (the flood control gate) at Road 721 and the Interceptor Canal. U.S. Photograph, Ex. 20, 21; Claimant's Ex. 89 (enlarged aerial map); Claimant's Photograph, Ex. 94(h), Video, Ex. 110. Nathan "Buddy" Platt stated that the entrance to the strip was gained via a wooden gate at a bridge on Road 78.

31. The multiple references to gates, with varying degrees of specificity, lead the Court to conclude that there were gates which limited access to the property but that such gates may have been traversed by members of a drug smuggling organization.

The foregoing detail is set forth principally to demonstrate the weakness in the government's proof and the difficulties which it had in establishing its case and defenses. The complex of positions taken make it quite difficult for the Court to conclude who went where or if at all.

### B. Innocence of owners as a defense to forfeiture

32. The Court now shifts the factual inquiry from the question of proof of probable cause to a determination of the claim of innocence presented by the Claimants. The defendant property was quitclaim deeded from Blanche Scarborough to S.J. & W. Ranches, Inc., on March 3, 1979. *Report of Agent King,* date dictated September 8, 1986, Ex. 82. S.J. & W. was incorporated in 1979. The corporation has continuously been held by no more than four individual shareholders, Blanche Scarborough (who died in 1981), Mildred Jones, Donald Jones, and Toni Jones Wiersma. Mrs. Scarborough's estate is subject to outstanding taxes, which are now the responsibility of the remaining shareholders. From 1981 to the present, the corporate shares and offices have been apportioned as follows: Mildred Jones, President, 46% of shares; Donald Jones, Vice–President, 27% of shares; Toni Jones Wiersma, Secretary–Treasurer, 27% of shares. Mildred Jones is the daughter of Blanche Scarborough. Donald Jones and Toni Jones Wiersma are the son and daughter of Mildred Jones.

33. On or about September 13, 1988, the date of filing the forfeiture action, there existed a written lease between S.J. & W. Ranches, Inc. and Scarborough Ranch, a Florida partnership, for use of the land to conduct a commercial cattle business. At the same time, there existed a written lease between S.J. & W. Ranches, Inc. and Scarborough Ranch Nurseries, Inc., a Florida corporation, for use of the land as a nursery and commercial tree harvesting operation. *Claimants' Answer to Amended Complaint,* filed Jan. 17, 1991, pages 9–10, *Trial testimony of Toni Wiersma,* November 3, 1993.

34. The United States concedes that Mildred Jones, Toni Jones Wiersma, and Donald Jones had no knowledge of the alleged use of the property for landing drug aircraft. It is through Bill Wiersma that the government hopes to impute such knowledge to the Claimant corporation. There is no testimony to the effect that Wiersma was ever present to investigate the crash site. On September 30, 1988, Mr. Fernandez told Agent King that he was 80% sure that Bill Wiersma was on the Defendant property in a blue pickup truck during a visit by members of the drug smuggling operation. The identification of Bill Wiersma by Mr. Fernandez, an identification which seemed to improve in accuracy over the years, is not adequate proof of Wiersma's involvement. Even assuming the veracity of Mr. Fernandez's identification of Bill Wiersma, it is entirely plausible that Wiersma was on the property. Bill Wiersma testified that he is there every day and some evenings. *Trial testimony of Bill Wiersma,* November 2, 1993. None of Mr.

Fernandez's statements implicate Wiersma as having done anything criminal—he is implicated with simply sitting in a pickup truck. Moreover, since Mr. Fernandez' recent statement offered through the testimony of Agent King—which is obviously hearsay—was offered to rebut the Claimant's innocent owner defense, it is not admissible. *United States v. 1012 Germantown Road,* 963 F.2d 1496 (11th Cir.1992); *United States v. 6109 Grubb Road,* 886 F.2d 618, 622, *reh'g en banc, denied,* 890 F.2d 659 (3rd Cir.1989).

35. There is no evidence in the record showing that the corporation received any benefit from the alleged drug activity or any other such activity. The corporate officers testified that no such benefits were received. Tax records and accounting documents show no such benefits. Mrs. Toni Wiersma testified that she is going back to work, allegedly to earn additional income (as a teacher), with no proof from the government to the contrary. Estate tax obligations continue.

36. Sergeant Herne interviewed Bill Wiersma on August 26, 1986. *Transcript of Interview with Bill Wiersma,* August 26, 1986, Ex. 111; *see, also, Report of Agent King,* Ex. 82, date dictated September 8, 1986 (referring to information received from Sergeant Herne). During this interview, Bill Wiersma told Sergeant Herne that he had no suspicion that the land was being used for drug smuggling, *Transcript of Interview,* p. 5. Wiersma also stated that Richard (Dickie) Platt is not a full time employee of S.J. & W., but that "when [Dickie Platt] works for me, he pretty well takes over the crew", and that Bill Wiersma "hire[s] the crew and then [he] tell[s] Dickey [sic] what to do". *Id.* at p. 7. Agent King's report states that Sergeant Herne was told by Bill Wiersma that he and Richard Platt were "close friends". *Report of Agent King,* Ex. 82, p. 2. The Court has read the pertinent portions of the transcript of Sergeant Herne's interview with Bill Wiersma and, as there is no indication of such a statement about Bill Wiersma's personal relationship with Richard Platt, rejects any such characterization of the relationship.

37. At trial Jerry Beck testified that he has a business partnership with Dickie Platt. *Trial testimony of Jerry Beck,* October 12,

1993. Jerry Beck has been the Clerk of the Glades County Court for seventeen years, and is the son of Ed Beck and brother of Paul Beck, who farms the family's property near the S.J. & W. Ranch.

38. All of the Platt brothers worked as cowboys for Bill Wiersma. None was a full time employee of S.J. & W. Payments were made by S.J. & W. to the Platt brothers when and if they performed daily ranch hand work. While the three Platt brothers were apparently involved in helping the drug importation group and while Dickie Platt did day work on the ranch, it does not appear that he ever had a position of sufficient authority so that criminal conduct in which he was engaged could be attributed to the owners. Indeed, it is rather clear that he did not. He worked a total of 51 days in 1985, 42 days in 1986, and 55–58 days in 1987 for S.J. & W. *Deposition of Mildred Jones,* read at trial on October 14, 1993; *Trial testimony of Toni Wiersma,* November 4, 1993, Ex. 70. No indictments were ever issued as to Dickie Platt. Dale Platt worked only limited days for S.J. & W. and did not work at all prior to February 1986. Dale Platt worked one day in 1986 and 23–25 days in 1987. *Trial testimony of Toni Wiersma,* November 4, 1993, Ex. 71. No indictments ever issued as to Dale Platt, although he had previously served a jail sentence with Alan Parrott. *Trial testimony of Agent King,* October 12, 1993. Nathan "Buddy" Platt, Jr., was employed as a Correctional Officer by the Okeechobee County Sheriff's Department in early 1986. *F.D.L.E. Report,* typed July 28, 1986, Ex. 80. He worked only rarely for S.J. & W. and not at all prior to 1988. *Trial testimony of Toni Wiersma,* November 4, 1993, Ex. 72. Nathan Platt was arrested on October 6, 1986, Ex. 22, and pled guilty to the state charge of accessory after the fact to trafficking in cocaine. His five year sentence was reversed on appeal, as being an unjustifiable departure from the guideline recommendation of no state prison sentence. *Nathan Platt v. State of Florida,* 515 So.2d 1068 (4DCA 1987). Nathan Platt was resentenced on February 10, 1988. *Affidavit of Agent King,* April 30, 1990, Ex. 1.

39. The United States introduced evidence of phone calls between the Platts and Bill Wiersma, which the United States asserts demonstrate a conspiracy to import controlled substances. There were no phone calls between Dickie Platt's phone number and Bill Wiersma's phone number. *Trial testimony of Agent King*, October 13, 1993, Ex. 85. Nathan "Buddy" Platt's phone number called Bill Wiersma's residence once, on March 21, 1986, for three minutes. *Trial testimony of Agent King*, November 4, 1993. Dale Platt's phone number called Bill Wiersma's phone on two occasions in November and December 1986. Ex. 85. Bill Wiersma's phone number called Dale Platt once in December 1986. Taken collectively, the Court finds that these calls were so limited as to prove nothing.

No one has directly (or indirectly by credible evidence) connected Bill Wiersma with the drug smuggling activity which allegedly occurred in early February 1986. It is therefore the conclusion of the Court that he was not involved in that activity. I conclude also that none of the owners were either directly or indirectly involved.

## II. CONCLUSIONS OF LAW

### A. Probable cause

#### 1. Legal Standard

Under 21 U.S.C. § 881(a)(7), property is subject to forfeiture under the following conditions:

> All real property, including any right, title and interest (including any leasehold interest) in the whole of any lot or tract of land and any appurtenances or improvements, which is used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, a violation of this title punishable by more than one year's imprisonment, except that no property shall be forfeited under this paragraph, to

the extent of an interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner.

In this case, the United States claims that it has probable cause to believe the S.J. & W. property was being used to commit or facilitate the knowing or intentional distribution of cocaine in violation of 21 U.S.C. § 841(a) and § 846.

 The initial burden on the probable cause issue rests with the United States. To meet its burden, the United States must show a "'reasonable ground for belief of guilt, supported by less than prima facie proof but more than mere suspicion.'" *United States v. $364,960*, 661 F.2d 319, 323 (5th Cir. Unit B 1981), (quoting *United States v. One 1978 Chevrolet Impala*, 614 F.2d 983, 984 (5th Cir.1980)). Probable cause may be based "wholly on circumstantial evidence, and that evidence may include facts learned after the actual seizure." *United States v. $41,305*, 802 F.2d 1339, 1343 (11th Cir.1986). However, the evidence must be gained *prior* to filing the forfeiture action. *United States v. $191,910*, 16 F.3d 1051 (9th Cir.1994); *United States v. $91,960*, 897 F.2d 1457, 1462 (8th Cir.1990); *United States v. $14,500*, 767 F.Supp. 1123 (M.D.Fla.1991). The forfeiture action in this case was filed on September 13, 1988.

"In order to obtain a forfeiture, the government need only show probable cause that a substantial connection exists between the property identified for forfeiture and associated illegal drug activity." *United States v. 2204 Barbara Lane*, 960 F.2d 126 (11th Cir. 1992) (affirming grant of summary judgment of forfeiture under § 881(a)(7) on basis of pleadings and unanswered requests for admissions).

In addition to the Eleventh[9] Circuit, the

---

9. *United States v. 2204 Barbara Lane*, 960 F.2d 126 (11th Cir.1992); *United States v. $4,255,000*, 762 F.2d 895, 903 (11th Cir.1985), *cert. denied*, 474 U.S. 1056, 106 S.Ct. 795, 88 L.Ed.2d 772 (1986).

Prior to 1992, the Eleventh Circuit stated that it "has not expressly adopted either [the substantial connection test or the "more than an inci-

dental or fortuitous connection" test] for forfeiture of real property under section 881(a)(7)." *United States v. Approximately 50 Acres of Real Property*, 920 F.2d 900, 902 (11th Cir.1991) (per curiam). The Eleventh Circuit was already applying the substantial connection test in forfeiture actions under 21 U.S.C. § 881(a)(4), *United States v. 15603 85th Ave., North*, 933 F.2d 976,

First [10], Fourth [11], and Eighth [12] Circuits all hold that in order to establish probable cause for forfeiture under § 881(a)(7), the government must prove that the property had a "substantial connection" to the illegal activity. Some other appellate courts are divided as to exactly what the government must show in order to prove probable cause for forfeiture of real property under 21 U.S.C. § 881(a)(7). The Seventh Circuit has rejected the substantial connection test, and instead requires the government to show only that the real property had "more than an incidental or fortuitous connection" to the crime.[13]

> Several circuits have declined to require a substantial connection test for forfeiture under § 881(a)(4), the provision from which the language in § 881(a)(7) is drawn. *See, United States v. 1964 Beechcraft Baron Aircraft*, 691 F.2d 725 (5th Cir.1982), *cert. denied*, 461 U.S. 914 [, 103 S.Ct. 1893, 77 L.Ed.2d 283] (1983); *United States v. One 1974 Cadillac Eldorado Sedan*, 548 F.2d 421, 423 (2d Cir.1977). One circuit has even refused to impose a substantial connection test under the stricter language of § 881(a)(6). *See, United States v. $5,644,540*, 799 F.2d 1357 (9th Cir.1986).

*United States v. 916 Douglas Avenue*, 903 F.2d 490, 494, n. 5 (7th Cir.1990) (finding that sufficient nexus existed, i.e., nexus was "not incidental or fortuitous", between house and illegal drug transaction to justify forfeiture), *cert. denied, sub nom, Born v. United States*, 498 U.S. 1126, 111 S.Ct. 1090, 112 L.Ed.2d 1194 (1991).

Defining the parameters of the "connection" between the item sought to be forfeited and the illegal act has resulted in decisions which gave the United States broad avenues in establishing the existence of probable cause. Most courts have required that the government meet the same burden of proof to establish probable cause in all types of forfeiture actions under § 881. *United States v. Lot 9, Block 2 of Donnybrook Place*, 919 F.2d 994, 997 (5th Cir.1990). The statute itself specifies, in paragraph (d), that the procedures relating to violations of the customs laws shall apply to forfeitures incurred under any of the provisions of § 881. Despite this apparent clarity, some courts have found it important to distinguish between the types of property or assets sought to be forfeited. For analytical purposes, the proof of probable cause is indeed similar, yet the facts connecting the purchase of real estate with illegal profits of a drug transaction (i.e., rendering property subject to forfeiture under 21 U.S.C. § 881(a)(4)) will necessarily entail different analyses than the facts establishing that a particular piece of real property was intended to be used as an airstrip for drug importation (i.e., rendering the property subject to forfeiture under 21 U.S.C. § 881(a)(7)).

### a. Guidance from civil forfeiture actions under § 881(a), generally

■ Some courts have applied a "substantial connection" test to forfeitures under § 881 without carefully analyzing the legislative history of the paragraph under which forfeiture is being sought. Although a court may not consider legislative history where a statute is clear on its face, *Board of Governors of Federal Reserve v. Dimension Financial Corp.*, 474 U.S. 361, 368, 106 S.Ct. 681, 685–86, 88 L.Ed.2d 691 (1986), ambiguity may exist even when a statute appears clear. Section 881, Paragraph 6 requires the forfeiture of "all moneys, negotiable instruments,

979 (11th Cir.1991), and § 881(a)(6), *United States v. Four Parcels of Real Property in Greene and Tuscaloosa Counties*, 941 F.2d 1428, 1440 (11th Cir.1991) (en banc); *United States v. $4,255,000*, 762 F.2d 895, 903 (11th Cir.1985), *cert. denied*, 474 U.S. 1056, 106 S.Ct. 795, 88 L.Ed.2d 772 (1986). District courts in the Eleventh Circuit have consistently applied the substantial connection test in forfeiture actions under 21 U.S.C. § 881(a)(7).

**10.** *United States v. 28 Emery Street*, 914 F.2d 1, 3–4 (1st Cir.1990).

**11.** *United States v. 7715 Betsy Bruce Lane*, 906 F.2d 110, 112–13 (4th Cir.1990); *United States v. Schifferli*, 895 F.2d 987, 989 (4th Cir.1990); *United States v. Santoro*, 866 F.2d 1538, 1542 (4th Cir.1989).

**12.** *United States v. 3639 2nd St. N.E.*, 869 F.2d 1093, 1096–97, *reh'g denied* (8th Cir.1989).

**13.** *United States v. 916 Douglas Ave.*, 903 F.2d 490, 493–94 (7th Cir.1990).

and securities" used or intended to be used to facilitate illegal drug transactions. Paragraph 7 provides similarly, but for "real property, including any right, title, and interest (including any leasehold interest) in the whole of any lot or tract of land and any appurtenances or improvements". While it seems logical that both paragraphs would require the same standard of proof as to probable cause, since they use highly similar language, there is some reason to doubt that Congress had the same intent. For example, paragraph 7 provides for forfeiture when real property is used to facilitate a violation **punishable by more than one year's imprisonment.** Paragraph 6 more broadly forfeits moneys used to facilitate any violation of the drug laws. Also, paragraph 6 was added in 1978, Pub.L. 95–633, § 301(1); and paragraph 7 was added six years later, in 1984, Pub.L. 98–473, § 306(a).

> The statutory provision at issue, 21 U.S.C. § 881(a)(6) [sic, should be 7], was enacted as part of the Comprehensive Forfeiture Act of 1984. 98 Stat. 2040. It is true that, as defendant asserts, the Senate Report accompanying this Act noted that the proposed forfeiture statute would lead to the seizure and forfeiture of property "indispensable to the commission of a crime." S.Rep. No. 225, 98th Cong., 1st Sess. 195, reprinted in 1984 U.S.Code Cong. & Admin.News 3182, 3378. But the Senate interpreted the new forfeiture provisions far more broadly: in the section-by-section analysis of the Senate bill, the Committee noted that the language that would become 21 U.S.C. § 881(a)(7) would provide for forfeiture of "real property which is used or intended to be used in a felony violation of the Drug Abuse Prevention and Control Act." *Id.* at 3398.

*United States v. 3120 Banneker Drive, N.E.,* 691 F.Supp. 497 (D.D.C.1988).

However, any distinction that may be drawn between real and personal property may be irrelevant. Justice O'Connor notes, in her dissenting (in part, and concurring, in part) opinion in *United States v. James Daniel Good Real Property,* —— U.S. ——, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993), that there is

no basis for distinguishing between real and personal property in the context of forfeiture of property used for criminal purposes. The required nexus between the property and the crime—that it be used to commit, or facilitate the commission of, a drug offense—is the same for forfeiture of real and personal property. *Id.* —— U.S. at ——, 114 S.Ct. at 512, 126 L.Ed.2d at 517. She also notes that *Austin v. United States,* —— U.S. ——, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993), construed the two statutory provisions equivalently.

The above discussion provides a context for the Court in weighing the nature of the "substantial connection" required in order to render the Defendant real property "guilty" and thereby subject to forfeiture.

Recently, in *United States v. $121,100,* 999 F.2d 1503 (11th Cir.1993), a forfeiture action under § 881(a)(6), the Eleventh Circuit again noted that

> [i]t is well established, both in the law of forfeiture and in other areas of the law, that the probable cause inquiry is a flexible one in which the court must consider the "totality of the circumstances." *E.g., Illinois v. Gates,* 462 U.S. 213, 230 [, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527] (1983) (Fourth Amendment search and seizure).

*Id.* at 1506.

" 'Probable cause' under section 881 is tested by the same criteria used to determine whether probable cause exists for a valid search and seizure: whether the government has provided a reasonable ground for believing that the house was used for illegal purposes." *United States v. Lot 9, Block 2 of Donnybrook Place,* 919 F.2d 994 (5th Cir. 1990); *see, also, United States v. One 1985 Chevrolet Corvette,* 914 F.2d 804, 809 (6th Cir.1990).

■ The probable cause showing need only link the defendant property with illegal drug activity generally, not to a particular transaction. *United States v. 228 Acres of Land,* 916 F.2d 808, 812 (2d Cir.1990), *cert. denied, sub nom, Moreno v. Drug Enforcement Admin.,* 498 U.S. 1091, 111 S.Ct. 972, 112 L.Ed.2d 1058 (1991). *United States v. One 1987 Jeep Wrangler,* 972 F.2d 472, 476

(2d Cir.1992). Property is forfeitable even without the presence of contraband. *One 1980 Bertram 58′ Motor Yacht,* 876 F.2d 884 (11th Cir.1989).

"When the parties have used property for 'general discussions ... about unspecified drug transactions,' that property has not facilitated illegal activity." *United States v. Approximately 50 Acres of Real Property,* 920 F.2d 900 (11th Cir.1991), (*citing, One 1980 Bertram 58′ Motor Yacht,* 876 F.2d at 887 (interpreting § 881(a)(4))); *see also, United States v. 28 Emery St.,* 914 F.2d 1, 5 (1st Cir.1990). In *Approximately 50 Acres,* the Eleventh Circuit upheld the forfeiture of property used to "negotiate and plan an essential component of a specific drug transaction that actually took place," *id.* 920 F.2d at 903. Although the court noted that "the presence or intended presence of drugs on the property is not a prerequisite to forfeiture under 881(a)(7)", the facts demonstrated that the conspirators met regularly on the property and discussed the details of their plan there, and that they travelled from the house to inspect the proposed landing site nearby.

■■■ A direct connection between the property subject to seizure and the illegal activity that renders property forfeitable need not be shown in order to establish probable cause. "[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates,* 462 U.S. 213, 244 n. 13, 103 S.Ct. 2317, 2335 n. 13, 76 L.Ed.2d 527 (1983). "Probable cause" is more commonly used in the search and seizure context, but its meaning here is no different: the government must supply evidence that, under the totality of the circumstances, establishes reasonable grounds for believing that the property facilitated the sale of drugs. *United States v. One 1974 Porsche 911–S,* 682 F.2d 283, 285 (1st Cir. 1982). "Facilitate" means to make the illegal activity "easy or less difficult". *United States v. One 1980 Bertram 58′ Motor Yacht,* 876 F.2d at 887 n. 3. This term should be broadly construed and should include a situation in which property is used as a cover for drug trafficking. *United States v. Rivera,*

884 F.2d 544, 546 (11th Cir.1989), *cert. denied,* 494 U.S. 1018, 110 S.Ct. 1322, 108 L.Ed.2d 497 (1990).

■■■ Property is "intended to be used" for an illegal activity when a person contemplates using the property in the future, and that person actually takes some "minimum initial step" to use the property. *United States v. One 1980 Bertram 58′ Motor Yacht.*

The United States relies heavily on *One 1980 Bertram 58′ Motor Yacht,* in which the Eleventh Circuit held that the motor yacht was subject to forfeiture pursuant to § 881(a)(4) despite the fact that there was no proof of drugs having been transported on the yacht. The court found that credible testimony concerning plans to modify the vessel for drug trafficking, as well as the stated intent of the purchaser of the yacht to use the vessel to transport controlled substances, was sufficient evidence to find that the vessel was "intended for use" in the transportation of illegal drugs. 21 U.S.C. § 881(a)(4). The vessel, known as the Mologa, was owned by a yacht broker, Vene Investments, who had contracted to sell the Mologa to Rodriguez, who was later arrested for drug trafficking. Vene Investments claimed an innocent owner defense which the Eleventh Circuit rejected. The court applied a stringent requirement, based on dictum from *Calero–Toledo v. Pearson Yacht Leasing,* 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974), that an innocent owner must prove that it did everything that reasonably could be expected of it to prevent the activity. In his dissent, Judge Vance criticized the majority decision as contrary to the intentions of the forfeiture statutes. "In my view more tangible involvement in a criminal act is required to render a property subject to forfeiture." *One 1980 Bertram 58′ Motor Yacht,* 876 F.2d at 889 (Vance, J. dissenting).

*b. Admissibility of evidence to establish probable cause*

■■■ Civil forfeiture proceedings allow the United States a broad interpretation of the traditional rules of evidence. For example, hearsay evidence is admissible to establish probable cause for forfeiture. *United States v. 1012 Germantown Road,* 963 F.2d

1496 (11th Cir.1992); *United States v. 900 Rio Vista Blvd.*, 803 F.2d 625, 629 (11th Cir.1986). While potential evidence of coercion (e.g., in the interviewing of Nathan Platt or Mr. Fernandez) affects the credibility of the witness' testimony, it does not affect its admissibility. *Wilcox v. Ford*, 813 F.2d 1140, 1148–49 (11th Cir.), *cert. denied*, 484 U.S. 925, 108 S.Ct. 287, 98 L.Ed.2d 247 (1987). "[T]he question of probable cause does not depend upon the admissibility of the evidence upon which the government relies, but only upon the legal sufficiency and reliability of the evidence." *United States v. 1982 Yukon Delta Houseboat*, 774 F.2d 1432, 1434 (9th Cir.1985).

■ Much of the evidence in this forfeiture case was developed after the initial seizure of the property. Claimants have attacked the seizure as lacking in notice. Even if the original seizure of the property was invalid, after-acquired untainted evidence may be considered to establish probable cause and allow the government to proceed with forfeiture. *United States v. One 1977 Mercedes Benz*, 708 F.2d 444, 450 (9th Cir. 1983), *cert. denied, sub nom, Webb v. United States*, 464 U.S. 1071, 104 S.Ct. 981, 79 L.Ed.2d 217 (1984).

While it is clear that evidence acquired after the filing of the forfeiture action cannot be used to establish probable cause, *United States v. $191,910*, 16 F.3d 1051 (9th Cir. 1994); *United States v. $91,960*, 897 F.2d 1457, 1462 (8th Cir.1990); *United States v. $14,500*, 767 F.Supp. 1123 (M.D.Fla.1991), there is no precedent on how the Court should consider after-acquired evidence which tends to destroy the government's basis for forfeiture. The Court assumes that the inquiry as to probable cause must in some sense be frozen at the time of filing the forfeiture action, unless the after-acquired evidence tends to bolster the government's position. While it seems unfair that the government can derive a benefit from later evidence but cannot be harmed by such later disclosures, the Court will proceed from this position.

### c. Importance of property owners' connection to the illegal acts

■ The Court questions whether real property can be forfeited where there is no allegation that the owners played a role in the illegal activities. While this may preview the presentation of the innocent owner defense, the Court notes that the overwhelming majority of real property civil forfeiture cases involve persons/claimants who were themselves involved in the illegal acts. Despite the reality of these cases, it is evident that conviction or even being charged for the underlying criminal activity is not a prerequisite for forfeiture of the property in a civil action. *United States v. Property Identified as 3120 Banneker Dr.*, 691 F.Supp. 497, 499 (D.D.C.1988).

> [I]f in order to show probable cause the government has to show in each instance that the property owner was involved with the illegal activity, then the government would have to establish the claimant's knowledge and consent; therefore, under claimant's interpretation of the statute no property owner would be able to invoke § 881(a)(7)'s "innocent owner" defense because knowledge and consent would already have been established by the government. That result would be inconsistent with the statute, which shifts the burden of persuasion to the claimant, once probable cause is established, to show by a preponderance of the evidence that he lacked knowledge of or consent to the illegal drug activity.

*United States v. 710 Main Street*, 744 F.Supp. 510 (S.D.N.Y.1990), *motion for rehearing denied*, 753 F.Supp. 121 (S.D.N.Y. 1990).

After the trilogy from the Supreme Court (*Good, Austin*, and *U.S. v. 92 Buena Vista Ave.*, —— U.S. ——, 113 S.Ct. 1126, 122 L.Ed.2d 469 (1993)), courts must now recognize a trend toward limiting the enormous powers of the United States in seeking civil forfeitures. Justice Thomas, in his partial concurrence and partial dissent in *Good* notes that civil forfeitures under § 881(a)(7) may now be so broad so as to differ "not only in degree, but in kind, from its historical antecedents." *James Daniel Good Real*

*Property,* —— U.S. at ——, 114 S.Ct. at 515, 126 L.Ed.2d at 521.

> It is difficult to see how such real property is necessarily in any sense 'guilty' of an offense, as could reasonably be argued of, for example, the distillery in *Dobbins's Distillery v. United States,* 96 U.S. 395 [, 24 L.Ed. 637] (1878), or the pirate vessel in *Harmony v. United States,* [43 U.S. 210,] 2 How. 210 [, 11 L.Ed. 239] (1844). Given that current practice under § 881(a)(7) appears to be far removed from the legal fiction upon which the civil forfeiture doctrine is based, it may be necessary—in an appropriate case—to reevaluate our generally deferential approach to legislative judgments in this area of civil forfeiture.

*James Daniel Good Real Property,* —— U.S. at ——, 114 S.Ct. at 515, 126 L.Ed.2d at 522 (Thomas, J., concurring, in part, and dissenting, in part) (footnote omitted).

### 2. Analysis

Several questions emerge from the government's evidence and efforts to show probable cause. First, most of the damaging testimony came through Agent King. He testified about statements which he took from Nathan "Buddy" Platt, Richard (Dickie) Platt, Lazaro Fernandez, Bill Wiersma, and others allegedly connected with the drug smuggling operation. The claimants demonstrated some of the weaknesses of Mr. Fernandez' testimony, as well as the arguable recantation of statements made by Nathan Platt. Agent King admitted that Judge Davis found Mr. Fernandez' credibility to be wanting.

Both parties offered evidence as to the nature of the alleged landing field and the ability of a Piper Navajo to land on that field, especially in the dark. S.J. & W. presented three expert witnesses, Stimpson, Kelly, and McKnight. The consistent message of these experts, of varying aeronautical specialties, was that a Piper Navajo plane could not have landed in the subject field without damage, and even if it had successfully landed, that it would not have been able to take off because of the denseness of the grass and irregularities in the surface. Mr. Stimpson presented an impressive command of the technical aspects of the Piper Navajo.

In response to these experts, the United States presented three witnesses of its own, all of whom had been secured in either September or October 1993. One was a convicted drug pilot who had just recently been released from jail. This individual testified that he had recently been to the property and could land a Piper Navajo on this property and take off again. Another government witness was a customs drug pilot who said substantially the same thing. A third witness, Mr. Coxey, who was present at almost every day of the trial, was challenged by the claimants as not having sufficient expertise. His testimony related mainly to the flight path of the plane, as evidenced by the results of the crash.

Despite the fact that the plane apparently never touched the Defendant property, the United States argues that it is not necessary for the subject property to have actually come into contact with any illegal substances. The government is apparently relying on the reasoning of *United States v. One 1979 Porsche Coupe,* 709 F.2d 1424 (11th Cir. 1983), which found that a vehicle which was used to "transport the 'pivotal figure in the transaction' several hundred miles to the precise location at which the attempted purchase [of a controlled substance] took place" was properly subject to forfeiture. *Id.* at 1427. The Eleventh Circuit found that a prior Fifth Circuit decision, *United States v. One 1977 Cadillac Coupe DeVille,* 644 F.2d 500 (5th Cir.1981) (Unit B), controlled the outcome. The Fifth Circuit upheld the forfeiture of an automobile whose sole connection with the crime was its use in transporting a narcotics supplier to the actual scene of the transaction.

This case is based on a slender reed in the first instance. The facts are that there were two deaths, one clearly explained (the pilot, Alan Beck), and the other under suspicious circumstances (a man named Gomez). There was a plane crash off the Defendant property. No drugs were found. Every bit of evidence attempting to establish the quantity of drugs that were on the plane is done through the statements of the smugglers. The only direct and tangible evidence offered to prove the existence of drugs was the testimony that "grommets" were found at the crash site, then mysteriously disappeared.

At first, law enforcement officers were not so much concerned with the location of the airstrip, they were directing their attention to the smuggling operation of Alan Parrott.

This Court originally found probable cause because not all of the testimony had been presented. I could not say that the law enforcement officers had no legitimate basis for believing that the property was used or intended to be used to import illegal substances, based on the statements of participants in the conspiracy. The alleged failed smuggling incident took place in early 1986. It is apparent that the forfeiture action was an afterthought; and that the ensuing investigation bore the difficulties of that late start. The forfeiture complaint was filed more than two years later. In the interim, very little investigation of the case took place. Bill Wiersma, allegedly the linchpin of the property's involvement, through whom the United States attempts to funnel its case, was interviewed on only one occasion. No law enforcement officers physically inspected the property. As to Mr. Fernandez's testimony, I must reject that testimony as defective, inadequate, and insincere.

The exposure of the many defects in this case has slowly unraveled the threads of the blanket of probable cause that the United States initially attempted to drape over the Defendant property. That blanket may no longer provide protection from the cold truth that the United States has failed to demonstrate any reason why the property should not be returned to the Claimants.

 Although it appears clear that the law in this circuit requires proof of a "substantial connection" between the property sought to be forfeited and the illegal act, the Court need not determine which level of proof of probable cause applies in § 881(a)(7) forfeiture actions, since the United States has failed to present credible evidence to support a showing of probable cause. Although proof of probable cause is a relatively light burden—"less than prima facie but

more than mere guesswork"—the United States has not carried the proof here. The United States has not proven that the Defendant property had more than an incidental or fortuitous connection to the crime. In fact, the United States has only barely shown that the property may have had an incidental connection to the crime of drug smuggling committed by the Parrott organization.

It at first appeared that, because of the statements on which the investigating officers relied, there was probable cause for forfeiture of at least a parcel of the property in question. Whether or not such probable cause would have extended beyond the forfeiture of that parcel is an open question—one which is unnecessary to address because of the Court's findings as to the innocence of the property owners. After considering the evidence presented at trial, the Court has determined that it is questionable whether this forfeiture action ever really had a valid basis. In arriving at this decision, the Court has, as indicated, benefitted from a retrospective examination of the reliability of the information provided to the investigating officers. Evidence acquired after the forfeiture was filed cannot be used to bolster an otherwise lacking proof of probable cause.

Lest my observations on the government's proof of probable cause be unclear, I observe, without deciding, that such proof at time of trial was unconvincing and, while not the fault of the government counsel, lacking in credibility. On the other hand the Claimants' proof presented in support of the innocent owner defense was strong and carried the day by more than a preponderance of the evidence. The government's response to that evidence did not alter this conclusion.

### B. Innocent owner defense

#### 1. Legal Standard

 Once probable cause is established in a forfeiture action, the burden of proof shifts to the claimant [14] to show by a

---

**14.** To contest a forfeiture action, a putative claimant must first demonstrate an interest in the seized property sufficient to satisfy the court of the individual's standing as a claimant. *United States v. Three Hundred Sixty Four Thousand*

*Nine Hundred Sixty Dollars,* 661 F.2d 319, 326 (5th Cir.1981). In *Bonner v. Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as precedent the decisions

preponderance of the evidence that the property is not subject to forfeiture. *United States v. One 1980 Bertram 58' Motor Yacht,* 876 F.2d 884 (11th Cir.1989). Under the "innocent owner" defense of 21 U.S.C. § 881(a)(7), a claimant can show that her property is not forfeitable if she establishes that she had no knowledge or, if she had knowledge, that she gave no consent to the illegal activity. *United States v. 6109 Grubb Road,* 886 F.2d 618, 626, *reh'g, en banc, denied,* 890 F.2d 659 (3d Cir.1989). The Eleventh Circuit has recently confirmed that this defense is available to any claimant who lacks *actual knowledge,* regardless of the reasonableness of this ignorance. *United States v. 6960 Miraflores Avenue,* 995 F.2d 1558 (11th Cir.1993) [on remand of *Republic National Bank of Miami v. United States,* — U.S. ——, 113 S.Ct. 554, 121 L.Ed.2d 474 (1992) ].

The Eleventh Circuit has directed that courts must, when evaluating forfeiture actions, "not only consider the statutory limitations, but the constitutional guarantees of core individual rights." *United States v. 1012 Germantown Road,* 963 F.2d 1496 (11th Cir.1992).

> The language of § 881(a)(7) reflects two interrelated aims of Congress, to punish criminals while ensuring that innocent persons are not penalized for their unwitting associations with wrongdoers.

*United States v. 15621 S.W. 209th Ave.,* 894 F.2d 1511, 1513 (11th Cir.1990).

Innocent owners are those who have no knowledge of the illegal activities or who have not consented to the illegal activities. *United States v. 6960 Miraflores Avenue,*[15] 995 F.2d 1558 (11th Cir.1993); *see, also, United States v. 1012 Germantown Road,* 963 F.2d at 1503 (reading the statute disjunctively, holding that an owner can avoid forfeiture by proving either ignorance or non-

of the former Fifth Circuit rendered prior to October 1, 1981.

The Claimants, S.J. & W., have met the standing requirement.

15. The Court in *6960 Miraflores Avenue* directly quotes *United States v. 15603 85th Ave. N.,* 933 F.2d 976 (11th Cir.1991), which states that an innocent owner is one who has no knowledge of the illegal activities and has not consented to the

consent); *United States v. 15603 85th Avenue,* 933 F.2d 976, 981 (11th Cir.1991) (landowner could not prove innocence as to forfeiture under § 881(a)(6) since owner had knowledge of co-owner's use of drug proceeds to purchase and improve property); *United States v. 141st Street Corporation by Hersh,* 911 F.2d 870, 878 (2d Cir.1990), *cert. denied,* 498 U.S. 1109, 111 S.Ct. 1017, 112 L.Ed.2d 1099 (1991) (discussing definition of consent, with implication that in order to consent to something one must have knowledge, thereby establishing that the statute should be read disjunctively; court permits forfeiture under § 881(a)(7) of apartment building used to facilitate drug dealing). The Eleventh Circuit has best stated the standard for establishing the innocent owner defense:

> Section 881(a)(7) explicitly permits a defense to forfeiture for those owners who can prove that they had no knowledge of illegal activity occurring on their property or who did not consent to that activity. Therefore, an owner can avoid forfeiture by proving either ignorance or non-consent.

*United States v. 1012 Germantown Road,* 963 F.2d at 1503. The court continues, in a footnote, to point out the error of other circuits that read § 881(a)(7) to require proof of both non-consent and ignorance in order to succeed in an innocent owner defense. *Id.* at 1503 n. 3.

The owner must have had actual knowledge of the criminal activity, for example, by being "significantly involved in a criminal enterprise", *United States v. 6960 Miraflores Avenue,* 995 F.2d 1558 (11th Cir.1993) (*citing United States v. U.S. Coin & Currency,* 401 U.S. 715, 721–22, 91 S.Ct. 1041, 1044–45, 28 L.Ed.2d 434 (1971)).

illegal activities, *id.* at 981. However, the court in *15603 85th Ave. N.* was clearly not reading the statute conjunctively, because the court later noted that a claimant who had actual knowledge of the illegal activity "may be spared forfeiture as an innocent owner if the claimant can prove that everything possible was done [to avoid the illegal activity]." 933 F.2d at 982.

■ The burden is on the claimant to prove absence of actual knowledge. *United States v. 6960 Miraflores Ave.* If the owner demonstrates a lack of actual knowledge, the government may then rebut and show by clear and convincing evidence that the owner had actual knowledge of the illegal activity. *United States v. $121,100.00*, 999 F.2d 1503 (11th Cir.1993).

Hearsay evidence cannot be admitted to rebut a claimant's innocent owner defense. *United States v. 6109 Grubb Road*, 886 F.2d 618 (3rd Cir.), *reh'g denied*, 890 F.2d 659 (3rd Cir.1989); *United States v. All Monies in Account No. 29–0101–62*, 746 F.Supp. 1432 (D.Haw.1990) (granting summary judgment for claimants on innocent owner defense of § 881(a)(6) forfeiture, court rejects government affidavits for violations of Rule 56(e) since not based on personal knowledge); *United States v. 710 Main Street*, 744 F.Supp. 510 (S.D.N.Y.1990), *motion for rehearing denied*, 753 F.Supp. 121 (S.D.N.Y. 1990) (although U.S. proved probable cause for forfeiture, owner of bar met innocent owner standard by proving that he did not consent to the drug activity). *Accord, United States v. 1012 Germantown Road* (rather than bifurcating the civil forfeiture proceeding, the trial court improperly allowed the government to present hearsay evidence before the jury).

Hearsay should not have been considered as to the 1993 and 1988 statements of Mr. Fernandez, as they were offered to rebut Claimants' proof of innocent ownership. *United States v. 6109 Grubb Road*, 886 F.2d 618. However, the Court will accept the evidence as admitted at trial and reject it as unreliable and unworthy of belief for the purposes of the Court's analysis.

### 2. Analysis

The United States concedes that the owners/shareholders of S.J. & W. knew nothing about the alleged illegal activity that forms the basis for this forfeiture action.

■ The United States responds to S.J. & W.'s proof on innocent ownership by alleging, first, that Bill Wiersma was aware of the alleged drug trafficking taking place on the property. Plaintiff's proof of knowledge hangs on a slender reed and, indeed, one which breaks under even casual examination. Bill Wiersma is the husband of one of the owners, Toni Jones Wiersma. He has had various positions of responsibility for many years—such as manager, foreman, etc. The door through which the Plaintiff United States seeks to pull Bill Wiersma and, thus, Claimants was said by Plaintiff to be Lazaro Fernandez. I have already commented at length on the escalating knowledge of Mr. Fernandez over the years, culminating in almost spectacular recollection in 1993 before the trial. I reject his hearsay not only for that reason but because it is simply not credible. The door to the Claimants' property must remain closed to Plaintiff.

Even if Bill Wiersma had been proven to have actual knowledge of the drug smuggling, it is doubtful that such knowledge would be sufficient to involve the corporation, of which Mr. Wiersma is not a shareholder. *See, United States v. 4,657 Acres*, 730 F.Supp. 423 (S.D.Fla.1989) (even though .31% shareholder had knowledge, such knowledge could not be imputed to corporation).

If Claimants establish a lack of actual knowledge of the illegal use of their property, as this Court hereby finds that they have done, there is no need to address the issue of consent to the illegal activity. *United States v. 1012 Germantown Road*, 963 F.2d 1496 (11th Cir.1992).

■ Plaintiff United States has argued to this Court that some theory of agency should apply to the facts of this case, thereby rendering the S.J. & W. corporation vulnerable to the severe sanction of forfeiture based on the actions of someone who worked for the ranch on a very occasional basis and/or because of the knowledge and conduct of Bill Wiersma. Plaintiff asks the Court to apply a theory of civil corporate liability which would ascribe the actions of corporate "agents" to the corporate officers. In particular, the United States argues that both Bill Wiersma and Dickie Platt were agents of S.J. & W., whose actions render the corporation subject to losing its property. This imputed criminal intent would be inap-

propriate and unfair under the facts of this case. Knowledge of or consent to an illegal act may be imputed to a partnership or corporation only when the knowledge was obtained or the consent given by an agent acting within the scope of his employment and for the benefit of the partnership or corporation. *Grand Union Co. v. United States,* 696 F.2d 888, 891 (11th Cir.1983). Plaintiff's position is without merit. Wiersma's role has already been discussed. Plaintiff's initial proof as well as its response to the "innocent owner" defense fail to implicate Wiersma in the illegal activity. As to Richard Platt, an occasional day worker for Claimant, neither his position nor his role in the alleged illegal activity are sufficient to bind the Claimant property owners.

Agency principles may be useful as a guide in determining corporate knowledge in the civil forfeiture context. In a case with uncontroverted evidence of a plane actually landing within the boundaries of the owners' property, the court refused to impute to innocent owners the criminal intent of one of the minor shareholders (and agents) of the corporate owner which held the property. *United States v. 4,657 Acres,* 730 F.Supp. 423 (S.D.Fla.1989).

 The Seventh Circuit has rejected the argument that a corporation should be strictly liable for forfeiture under § 881(a)(7) for the drug transactions conducted on the property by one of its shareholders. In *United States v. 7326 Highway 45 North,* 965 F.2d 311, *reh'g, en banc, denied* (7th Cir.1992), the court found that the illegal[16] actions of a one-third shareholder, who directed the day-to-day operations of the property, could not be imputed to the corporation for purposes of forfeiture. Although acknowledging that the result in that case "turn[ed] closely on the facts", the court explicitly found that a shareholder was acting outside the scope of his employment when he was not acting at least in part for the benefit of the corporation.

"Only knowledge obtained by corporate employees acting within the scope of their employment is imputed to the corporation." *United States v. 7326 Highway 45 North,* 965 F.2d at 316. The Seventh Circuit also dismissed as unnecessary any consideration of the "adverse agent"[17] exception to the imputation of knowledge theory. Finding that the one-third shareholder did not obtain knowledge of his activities while acting to benefit his principal, the Seventh Circuit refused to impute his knowledge to the corporation. 965 F.2d at 317.

 In response to a vigorous dissent by Judge Posner, the Seventh Circuit reasoned that consideration of the one-third shareholder's "apparent authority" was misplaced. The theory of apparent authority renders a principal vicariously liable to an innocent third party for injury resulting from the misrepresentations or misdeeds of the principal's agent who acted with apparent authority from the principal. Under the apparent authority theory, principals are liable even if the principal derives no benefit from the agent's actions and even if the agent acts entirely for his own purposes. *American Society of Mechanical Engineer, Inc. v. Hydrolevel Corp.,* 456 U.S. 556, 565–67, 102 S.Ct. 1935, 1942–43, 72 L.Ed.2d 330 (1982). "[T]he apparent authority doctrine should not enter into a section 881(a)(7) analysis. Apparent authority does not impute actual knowledge to a principal. Instead, it saddles the principal with vicarious liability for the misdeeds of an agent in spite of the principal's lack of knowledge. In effect, it is a principal of strict liability." *7326 Highway 45 North,* 965 F.2d at 319.

In a § 881(a)(7) forfeiture case, the Second Circuit, in *United States v. 141st Street Corp.,* 911 F.2d 870 (2d Cir.1990), *cert. denied,* 498 U.S. 1109, 111 S.Ct. 1017, 112 L.Ed.2d 1099 (1991), rejected a claimant corporations's argument that the corporation's

---

**16.** In a separate criminal action, that shareholder pleaded guilty to violations of 21 U.S.C. § 846, many of which had been conducted on the property sought to be forfeited.

**17.** Under the adverse agent exception, when an agent is involved in matters damaging to the

corporation, his knowledge is not imputed to the corporation even if he obtains the knowledge while acting within the scope of his agency because the presumption that the agent will report information of his activities to the corporation is invalid.

apartment building superintendent was an adverse agent whose knowledge of drug trafficking on the premises could not be imputed to the corporation. The court reasoned that the claimant corporation shared in the exorbitant rents charged by the superintendent (apparently as bribes received from the drug dealers), and therefore the agent was acting to benefit the corporation.

In the Eleventh Circuit, knowledge of an illegal act is imputed to the corporation only if the agent is acting within the scope of his employment and for the benefit of the employer. *Grand Union Co. v. United States,* 696 F.2d 888 (11th Cir.1983) (in a False Claims Act case, **knowledge** of employee was imputed to corporation since employee acted for the benefit of the corporation and within the scope of his employment). For example, where a drug trafficker protected his illegally gained assets in a sham corporation, property held by that corporation would be properly subject to forfeiture. *United States v. 900 Rio Vista Blvd.,* 803 F.2d 625 (11th Cir.1986).

In a case with facts that are quite similar to those before this Court, the property was returned to the corporate owners because the agent's conduct was not imputed to the corporation. *United States v. 4,657 Acres,* 730 F.Supp. 423, 426–27 (S.D.Fla.1989).

The S.J. & W. corporation has presented essentially undisputed evidence that it had no knowledge whatsoever of any drug trafficking taking place on its property. Accordingly, S.J. & W. has met its burden by proving by more than a preponderance of the evidence that it had no knowledge of any intended use of its property as a landing site for the allegedly drug-laden Piper Navajo airplane that crashed in early February 1986.

### CONCLUSION

Because of the length of these proceedings and the importance to the parties (and perhaps others) of the issues involved, more time was taken and space used than was perhaps necessary. Yet we treat here with fundamental rights of ownership and the loss of those rights. In the understandable zeal to enforce the criminal laws constant vigilance must be exercised to protect the rights of all—especially those who may be caught up in a net loosely thrown around those who are guilty. Here the basis for forfeiture was weak from the beginning.

After having heard all of the evidence in the case, the Court concludes that the United States' case on probable cause is probably wanting. However, it is not necessary to finally decide this issue because the case presented by Claimants is so clear and the response by the United States is sufficiently wanting that the Court has determined that Claimants are indeed innocent owners entitled to the remedy of return of their property.

Consequently, S.J. & W.'s interest in the property is entirely free from forfeiture. It is hereby

ORDERED AND ADJUDGED that Claimants have proven that they are indeed innocent owners within the statutory provision. Thus, the Defendant property is not subject to forfeiture for the illegal activities of the Parrott smuggling organization. A final judgment will be entered by separate order reflecting these findings.

DONE AND ORDERED.